IN THE UNITED STATES DISTRICT COURT FILED

NORTHERN DISTRICT OF ALABAMA

NORTHEASTERN DIVISION          03 JUN 19 PM 2:50

U.S. DISTRICT COURT
N.D. OF ALABAMA

| | |
|---|---|
| TYSON FARMS, INC., | ) |
| PLAINTIFF, | ) |
| VS. | )          CV-01-H-2007-NE |
| MICKY YANCY, | ) |
| DEFENDANT. | ) |

ENTERED

JUN 1 9 2003

## MEMORANDUM OF DECISION

### I.  Procedural History

On August 8, 2001 Tyson Farms, Inc., a North Carolina
Corporation, filed a four-count complaint against defendant Micky
Yancy.  Count I seeks a declaration that Tyson Farms, Inc. has
not breached a January 28, 1997 contract and an August 6, 1998
contract it had with Micky Yancy.  Count II seeks a declaration
that Tyson Farms, Inc. has not maliciously prosecuted Micky
Yancy.  Count III seeks a declaration that Tyson Farms, Inc. has
not defamed Micky Yancy.  Count IV seeks to recover $22,601.95 in
damages from Micky Yancy resulting from a breach by him of the
January 28, 1997 and August 6, 1998 contracts (these two
contracts are collectively referred to herein as "the Contracts")
he had with Tyson Farms, Inc.  The complaint was amended to add a
Count V in which Tyson Farms, Inc. seeks damages for alleged
fraud and suppression by Micky Yancy and a Count VI seeking a

55

declaration that Tyson Farms, Inc. has not breached obligations it owed to Yancy under the Packers and Stockyards Act. Micky Yancy filed an answer which contains a counterclaim against Tyson Farms, Inc. to recover $15,129.00 in damages from Tyson Farms for its breach of the Contracts.[1]

The court has before it the November 8, 2002 motion of plaintiff for summary judgment in plaintiff's favor under Counts I, II, III, IV and VI of the complaint, as amended,[2] and in plaintiff's favor on the counterclaim of defendant.  The court also has before it the November 8, 2002 motion of defendant for summary judgment in defendant's favor on all claims asserted by plaintiff in the complaint, as amended.  Briefs have been submitted by plaintiff in connection with both motions on November 8, 2002 and December 10, 2002.  Evidence has been submitted by plaintiff in connection with both motions on November 8, 2002 and December 3, 2002.[3]  Briefs have been

---

[1]  The January 28, 1997 contract was actually between Tyson Foods of Alabama, Inc. and Micky Yancy, and the August 6, 1998 contract was actually between Tyson Foods of Alabama, Inc. and Micky Yancy d/b/a Y & Y Farms.  Failing to notice the uncontested fact that Tyson Foods of Alabama, Inc. merged into Tyson Farms, Inc., a North Carolina corporation, on January 29, 1999, the court granted plaintiff's November 8, 2002 motion for summary judgment, entering final judgment in favor of Tyson Foods, Inc. On April 10, 2003 the court set aside such final judgment.  In this memorandum of decision, "Tyson Farms" or "plaintiff" includes Tyson Farms of Alabama, Inc. and Tyson Farms, Inc.

[2]  Plaintiff's motion does not seek summary judgment as to Count V.

[3]  Plaintiff has submitted transcript of proceedings in State of Alabama v. Mickey Yancy; transcript of Mickey Yancy's deposition (June 18, 2002); broiler contract between Tyson Foods of Alabama, Inc. and Mickey Yancy (January 28, 1997); broiler

submitted by defendant with regard to both motions on November 26, 2002 and December 10, 2002.  Evidence has been submitted by defendant with regard to both motions on November 19, 2002 and December 3, 2002.[4]  The court views all briefs and evidence,

---

contract between Tyson Foods of Alabama, Inc. and Y & Y Farms (August 7, 1998); newspaper article entitled "Arrests Made in Alleged Feed Thefts," published in the Cullman Times on June 21, 2000; excerpts from telephone records produced pursuant to Tyson's subpoena of September 4, 2002 to BellSouth; transcript of Jennifer Yancy Satterfield's deposition (June 18, 2002); declaration of Tyson Farms, Inc. by and through R. Read Hudson; and declaration of Tyson Farms, Inc., by and through Greg Compton.

[4] Defendant has submitted newspaper article entitled "Chicken Farmer Not Guilty" published in The Cullman Times on June 22, 2001; Indictment against Mickey Yancy for receiving stolen property first degree dated June 29, 2000; Warrant No. WR-00-750 Complaint against Mickey Yancy for receiving stolen property first degree dated June 7, 2000; trial verdict form for receipt of stolen property first degree; trial verdict form for and theft of property first degree; deposition of Eugene Landman dated March 23, 1995; deposition of Dale Gambrill dated October 10, 2002 w/attached exhibits; Eugene Landman restitution agreement entered on March 26, 2002 payable to Tyson Foods, Inc.; Indictment against Eugene Landman for theft of property first degree dated June 28, 2000; motion for judgment of acquittal for Mickey Yancy dated June 20, 2001; Count I of the grand jury indictment filed on April 10, 2001 against Mickey Yancy; Tyson Foods, Inc. grower reimbursements; Tyson Foods, Inc. feed tickets; Tyson Foods, Inc. broiler growing guide dated January 1998; Tyson Foods, Inc. grower recaps and broiler production settlements; Tyson Foods, Inc. broiler processing sales recap and poultry condemnation certificates; Tyson Foods, Inc. environmental poultry farm management; Tyson Foods, Inc. checks to Mickey Yancy 5/5/99 - 6/14/00; Tyson Foods, Inc. W-2s for Mickey Yancy for 1999 and 2000; voluntary statement to Cullman County Sheriff Department dated 5/11/00 from Mike Saylor; voluntary statement to Cullman County Sheriff Department dated 5/16/00 from Larry Butler; voluntary statement to Cullman County Sheriff Department dated 5/26/00 from James Bridges; voluntary statement to Cullman County Sheriff Department dated 5/15/00 from Eugene Landman; voluntary statement to Cullman County Sheriff Department dated 5/27/00 from Matthew Wood; and Warrant No. WR-00-749 Complaint against Eugene Landman signed by Jimmy Morrow dated June 7, 2000.

regardless of the filing party, as applicable to all issues
raised in the two motions which are now under submission pursuant
to the April 10, 2003 order.

## II. Standards for Evaluating a Summary Judgment Motion

Under Federal Rule of Civil Procedure 56(c), summary
judgment is proper "if the pleadings, depositions, answers to
interrogatories, and admissions on file, together with the
affidavits, if any, show that there is no genuine issue as to any
material fact and that the moving party is entitled to judgment
as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322
(1986). The party asking for summary judgment always bears the
initial responsibility of informing the court of the basis for
its motion and identifying those portions of the pleadings or
filings which it believes demonstrate the absence of a genuine
issue of material fact. See id. at 323. Once the moving party
has met his burden, Rule 56(e) requires the nonmoving party to go
beyond the pleadings and by his own affidavits, or by the
depositions, answers to interrogatories, and admissions on file,
designate specific facts showing that there is a genuine issue
for trial. See id. at 324.

The substantive law will identify which facts are material
and which are irrelevant. See Anderson v. Liberty Lobby, Inc.,
477 U.S. 242, 248 (1986). All reasonable doubts about the facts
and all justifiable inferences are resolved in favor of the non-
movant. See Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115

(11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." <u>Anderson</u>, 477 U.S. at 248. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. <u>See</u> <u>id.</u> at 249.

The method used by the party moving for summary judgment to discharge its initial burden depends on whether that party bears the burden of proof on the issue at trial. <u>See</u> <u>Fitzpatrick</u>, 2 F.3d at 1115-17 (citing <u>United States v. Four Parcels of Real Property</u>, 941 F.2d 1428 (11th Cir. 1991)(<u>en banc</u>)). If the moving party bears the burden of proof at trial, then it can only meet its initial burden on summary judgment by coming forward with positive evidence demonstrating the absence of a genuine issue of material fact; i.e. facts that would entitle it to a directed verdict if not controverted at trial. <u>See</u> <u>Fitzpatrick</u>, 2 F.3d at 1115. Once the moving party makes such a showing, the burden shifts to the non-moving party to produce significant, probative evidence demonstrating a genuine issue for trial.

If the moving party does not bear the burden of proof at trial, it can satisfy its initial burden on summary judgment in either of two ways. First, the moving party may produce affirmative evidence negating a material fact, thus demonstrating that the non-moving party will be unable to prove its case at trial. Once the moving party satisfies its burden using this method, the non-moving party must respond with positive evidence sufficient to resist a motion for directed verdict at trial.

The second method by which the moving party who does not bear the burden of proof at trial can satisfy its initial burden on summary judgment is to <u>affirmatively</u> show the absence of evidence in the record to support a judgment for the non-moving party on the issue in question.  This method requires more than a simple statement that the non-moving party cannot meet its burden at trial but does not require evidence negating the non-movant's claim; it simply requires the movant to point out to the district court that there is an absence of evidence to support the non-moving party's case.  See <u>Fitzpatrick</u>, 2 F.3d at 1115-16.  If the movant meets its initial burden by using this second method, the non-moving party may either point out to the court record evidence, overlooked or ignored by the movant, sufficient to withstand a directed verdict, or the non-moving party may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency.  However, when responding, the non-movant can no longer rest on mere allegations, but must set forth evidence of specific facts.  See <u>Lewis v. Casey</u>, 518 U.S. 343, 358 (1996) (citing <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 561 (1992)).

### III Relevant Undisputed Facts[5]

Tyson Farms primarily engages in the business of producing, processing, and manufacturing chicken and chicken-based products.[6] As part of its business, Tyson Farms operates a vertically integrated chicken processing operation which allows Tyson Farms to control its chicken products from the egg to the finished product.  Within this operation, there are four distinct stages:  (a) breeding, (b) hatching, (c) growout (the phase in which Yancy, as an independent "grower," was involved), and (d) processing.  Tyson Farms houses its breeder hens under especially exacting health standards at farms referred to as "Breeder Farms."  Once the breeder hens have produced eggs, the eggs are collected three times a week and taken to Tyson Farms' hatchery. After the chicks hatch from their eggs in carefully observed and maintained incubators, the chicks are treated with medicine to avoid potential disease and taken to farms owned by independent "growers," that is, farmers who raise the birds from chicks until they are fully grown and ready to be taken to the processing

---

[5] A few of the "facts" provided by the parties in this case are inconsistent.  Still, the court will narrate these "facts" in the light most favorable to defendant since he is the non-moving party as to plaintiff's motion for summary judgment, see Lytle v. Household Mfg., Inc., 284 F.3d 1188, 1190 (11th Cir. 2002), even though the "facts" accepted at this summary judgment stage may not be the actual facts of the case.  See Priester v. City of Riviera Beach, 208 F.3d 919, 925 n. 3 (11th Cir. 2000).

[6] The facts stated in this paragraph and the next three paragraphs are taken almost verbatim from allegations in the complaint which are totally admitted by defendant.  (See Complaint, paragraphs 1, 6-31 and 37 (doc. no. 1) and Answer to such paragraphs (doc. no. 9).)

plant.  Within Tyson Farms' integrated process, this time period
in which the chickens are cared for by the growers is referred to
as the "growout phase."

Tyson Farms contracts with approximately 6,500 chicken
growers across sixteen states.  These chicken growers are grouped
into geographically based "complexes."  Under the standard
contract with each grower, Tyson Farms supplies to the grower all
the chickens, feed, medicines, and technical support needed
during the growout phase.  The grower supplies the required
housing, labor, and utilities.  Importantly, although the
chickens, feed and medicines are delivered to the grower, title
in those items remains with Tyson Farms at all times.  During the
growout phase, Tyson Farms delivers to each farmer the feed
necessary for growing the chickens.  At each delivery, Tyson
Farms carefully records the kind and amount of feed delivered to
each grower, and both Tyson Farms and the grower keep a "feed
delivery ticket" evidencing the amount of feed delivered.
Specifically, Tyson Farms' contracts provide that:  "The Company
shall provide the [grower] with a legible copy of the...feed
delivery ticket at the time of delivery."  After the
approximately seven week growout phase, Tyson Farms takes its
chickens from the growers to the processing plant and carefully
records the weight of the chickens picked up from each grower's
farm.  Shortly after picking up the chickens, Tyson Farms picks
up any unused feed from the grower and carefully records the
amount of feed returned by each grower.  Tyson Farms later

8

redistributes the unused feed, as it is needed by other growers. Under Tyson Farms' grower contract, each grower is compensated under a competitively based model which is designed to reward growers who raise the chicks most efficiently.  The process of ranking and paying growers is called the "settlement process." The settlement process factors in the number of chickens provided a particular grower, the total weight of that grower's chickens as delivered to the processing plant, and importantly, the exact amount of feed the grower used to raise the chickens.  Tyson Farms then measures the production efficiency of each grower in comparison with the other Tyson Farms growers in the pre-defined complex whose flocks are picked in a given week.  This production efficiency is calculated by comparing the total weight of chickens delivered against the number of chicks delivered to a grower and the total amount of feed utilized to achieve that weight.  That is, the grower who delivers the largest and healthiest chickens using the least amount of feed is considered the most efficient.  Under its contract, Tyson Farms then compensates the growers of each complex on a pay scale based upon each grower's relative efficiency.  Accordingly, the growers in each complex who are more "efficient" during a particular settlement period receive higher compensation than those who are less efficient during the same period.

Although Yancy and Tyson Farms' business relationship dates back to the 1980's, Yancy and Tyson Farms entered into the first contract at issue in this case on or about January 28, 1997.

Tyson Farms and Yancy (doing business as "Y & Y Farms") entered into another, separate, contract at issue in this case on or about August 6, 1998. As mentioned above, Tyson Farms was required, pursuant to the Contracts to supply Yancy with chickens, feed, veterinary services, technical support and medications. Under the Contracts, Yancy was required "to furnish all labor, utilities, bedding, supplies and well-maintained housing and equipment." Furthermore, Yancy agreed "that he would not use or allow to be used during the period of this Contract any feed, medication, herbicides, pesticides, rodenticides, insecticides or any other item except as supplied or approved in writing by the Company." Finally, the Contracts include a specific compensation plan, expressly incorporated into the Contracts. Under the terms of the payment plan, Yancy's compensation was tied directly to a computation referred to as "Net Pound Value." As described above, the "Net Pound Value" figure essentially measured Tyson Farms' investment in each pound of chicken and provides Yancy with incentive to produce that meatiest (and healthiest) bird possible while minimizing wasted feed.[7] The settlement process requires Tyson Farms to determine the Net Pound Value for each grower and compare that value to the "Adjusted Average Net Pound Value," i.e., the average Net Pound Value for all growers within the Snead Complex (the area within

---

[7] Technically, the Net Pound Value is the sum of number of chicks valued at $0.19 apiece and the number of pounds of feed valued at $0.095 per pound. This figure is then divided by the net weight in pounds of the chickens ultimately taken from the grower to the processing plant.

which Yancy's farms are located) who sent chickens to the
processing plant in a given week.  If a grower's Net Pound Value
is less than the Adjusted Average Net Pound Value - indicating
that the grower had been able to produce larger and healthier
chickens with a more efficient use of feed - then the grower
receives a higher price per pound of chicken sent to the
processing plant, relative to the other growers in the complex.[8]
On the other hand, if the grower's Net Pound Value is greater
than the Adjusted Average Net Pound Value - indicating that the
grower failed to produce as much chicken as he should have given
the amount of feed invested - then the grower receives a lower
price per pound of chicken sent to the processing plant, relative
to the other growers in the complex.

Eugene Landman was employed as a driver for Tyson Farms in
the Snead Complex, in which complex Yancy's operation was
assigned.  One of Landman's job duties included picking up unused
chicken feed from the growers, weighing and recording the amount
of feed picked up from each grower, and then returning the feed
to Tyson Farms for later redistribution.  Landman's pick up route
included Yancy's farm.  During late 1999 and early 2000, Tyson
Farms began to notice some irregularities in its Snead Complex.
Specifically, it began to notice that Yancy, who had previously
been much less efficient than the other growers in the complex
(and accordingly paid less in relation to those growers), became

---

[8]  Adjusted Average Net Pound Value is the average net pound
value of all the growers for the settlement period except those
"who are Company management employees or their immediate family.

11

one of the most efficient growers in the entire complex (and
therefore, began being paid more than the other growers).  Prior
to May 1, 1999, Yancy's ranking among other growers within the
Snead Complex had never risen above 9th for a particular growing
cycle, had ranged as high as 18th, and had averaged 14th.
Additionally, Yancy had never been more than 6,281 pounds under
his expected feed use in a specific growing cycle.  However, for
the growing cycle ending May 1, 1999, Yancy's comparative rank
jumped to 2nd and his feed usage was 30,215 pounds under its
expected value.  For the next six growing cycles, Yancy finished
either first or second in the Snead Complex and averaged using
31,339 fewer pounds of feed than expected - only once coming
within 10 tons of his expected use.

Once Yancy moved to the top of plaintiff's ranking in the
Snead Complex, other growers with whom he competed started
grumbling.  (See Pl.'s Evid. Sub., Tab D, Def.'s dep. 150-156.)
Yancy first started hearing about the grumbling in February 2000
after attending a grower seminar.  (See id.)  Among other things
the growers were accusing him of "getting feed and stuff like
that" and "getting extra feed."  (See id. at 152 and 155.)

After an investigation by local authorities, a complaint was
filed on June 7, 2000 against Eugene Landman for obtaining by
deception control over chicken feed with the intent to deprive
the owner of such feed, leading to Landman's indictment on
June 28, 2000 for theft of property, first degree.  (See Def.'s

Evid. Sub., Tab 25 and Tab 9.)  Also, as a result of such
investigation, a complaint, signed by Jimmy Morrow[9], was filed on
June 7, 2000 against Yancy for receiving stolen chicken feed,
knowing or having reasonable grounds to believe it was stolen,
leading to Yancy's indictment on June 28, 2000 for receiving
stolen property, first degree.  (See Def.'s Evid. Sub., Tab 3 and
Tab 2.)  Landman subsequently entered a plea of guilty and
testified at the June 18, 2001 trial of Yancy, which resulted in
a "not guilty" verdict.  Landman testified that in February or
March of 1999 Yancy initiated with him a conversation about
paying him for delivering to him extra feed Landman picked up
from other growers; Landman further testified that from that time
until May 5, 2000, he made numerous deliveries of unauthorized
feed totaling over 130,000 pounds (65 tons) to various locations
designated by telephone calls to his home from Yancy for which
feed Yancy secretly paid him $100 for each 10,000 pounds (5
tons).  (See Pl.'s Evid. Sub., Tab C, transcript of trial of
State v. Yancy, at 162-66, 170-72.)  While Yancy does not
dispute the fact that Landman testified in this fashion, Yancy
strongly disputes the testimony itself.  Yancy does admit that he
received extra feed during the relevant time period, but states
he was not aware of this fact until April 27, 2000 when he and
Landman had a conversation in which Landman told Yancy "if I go
down, you go down."  (See id. at 304).  Although Landman

---

[9] Jimmy Morrow was an investigator for the Cullman County
Sheriff's Department.  (See Pl.'s Evid. Sub., Tab C, transcript
of trial of State v. Yancy, at 247.)

13

expressly testified that the deliveries were preceded by a
telephone call to his house from Yancy, Yancy expressly states he
did not call Landman's home prior to this April 27, 2000
conversation.  (See id. at 300.)  It is undisputed, however, that
someone from Yancy's home phone (number 256-796-7702) called
Landman's home (number 205-429-4274) on June 6, 1999, July 10,
1999, December 8, 1999, December 16, 1999, February 10, 2000,
February 21, 2000, March 6, 2000 and May 4, 2000.  (See  Pl.'s
Evid. Sub., Tab H, Aff. of Deborah Trautwein and attached Bell
South records.)  The May 4, 2000 telephone call may be
particularly significant in view of the testimony during Yancy's
trial of Chris Carter, employed as a broiler service technician
for Tyson Foods, Inc., at the Snead Complex.  (See Pl.'s Evid.
Sub., Tab C, transcript of trial of State v. Yancy at 87-94.)
Carter's normal job was to visit the growers weekly to check the
welfare of the chickens and to see if anything needed to be done.
(See id. at 89.)  As a result of Yancy's sudden improvement in
feed conversions, Carter was requested to visit both of Yancy's
two farms more frequently to check on his feed inventories.  (See
id. at 89-90.)  On May 4, 2000 Carter checked and found the
inventory at Yancy's first farm to be 36,000 pounds and the
inventory at Yancy's second farm to be 13,000 pounds.  On May 5,
2000 Carter again checked and found the inventory at Yancy's
first farm had increased from 36,000 pounds to 52,000 pounds and
found the inventory at Yancy's second farm had increased from
13,000 pounds to 19,000 pounds.  (See id. at 92-93.)  No

14

authorized deliveries of feed were scheduled to either farm
during May 4-5, 2000.  (See id. at 93-94.)  Landman testified at
Yancy's trial that he made his last delivery of the unauthorized
feed to Yancy on May 5, 2000.  (See Pl.'s Evid. Sub., Tab C,
transcript of trial of State v. Yancy at 171-172.)    This was
the day after someone called Landman's home from Yancy's home on
May 4, 2000.  (See Pl.'s Evid. Sub., Tab H, Aff. of Deborah
Trautwein and attached Bell South records.)  Such delivery would
have been after the April 27, 2000 conversation between Landman
and Yancy during which Yancy states he first learned of the extra
feed deliveries.  (See id. at 304).

Around the first of April, 2000, the last chicks were
delivered to Yancy for "growout" under the Contracts.  The
chickens resulting from these chicks were picked up for slaughter
on June 9, 2000.  Payment under the Contracts to Yancy was not
due until "ten (10) days following the week of slaughter," (See
paragraph 3 of the Contracts, Pl.'s Evid. Sub., Tab E and Tab F).
Tyson Farms has refused to pay Yancy for raising these last
chicks to become chickens, and Tyson Farms has refused to place
any chicks with Yancy since the June 9, 2000 pick-up of the
chickens.  (See paragraph 42 of the Complaint and defendant's
Answer; also see paragraph 10 of the Contracts, Pl.'s Evid. Sub.,
Tab E and Tab F.)  While the Contracts place the duty of payment
on Tyson Farms to pay growers in the Snead Complex, the actual
payments were made by Tyson Foods, Inc., but a payment by Tyson
Foods, Inc. to a Tyson Farms grower is accounted for as an

expense to Tyson Farms, Inc.  (See Pl.'s Evid. Sub., Tab K, affidavit of Greg Compton.)  Thus the payments of $18,612 made by Tyson Foods, Inc. to compensate growers in the Snead Complex for a shortage in money paid them as a result of payments made to Yancy based upon his increased production were a debt on the books of Tyson Farms.  (See id.  Also see Pl.'s Evid. Sub., Tab C, transcript of trial of State v. Yancy, at 85, 207-208, 214-216; also see Def.'s Sub., Tab 7, deposition of Dale Gambrill at 144-45.)

## IV.  Discussion as to Count I[10]

As noted earlier, the cross motions by the parties each seek summary judgment in their favor with regard to Count I of the complaint wherein Tyson Farms seeks a declaration that it has not breached the Contracts.  An actual controversy exists between the parties regarding the parties' compliance, vel non, with the Contracts and the effect, if any, of the failure of a party to comply with material provisions of the Contracts.  Indeed, in addition to the counterclaim filed herein, about four months after Tyson Farms filed its motion for summary judgment Yancy filed in the Circuit Court of Jefferson County, Alabama multiple

---

[10]  This discussion will also be relevant to an issue under Count IV, discussed infra in Section VI;  to Tyson Foods' motion for summary judgment in its favor on Yancy's counterclaim discussed infra in Section VIII; and to Yancy's motion for summary judgment in his favor under Count V (not embraced in Tyson Farms' motion) discussed infra in Section IX.

16

claims against Tyson Farms and other defendants which claims
include virtually all the claims and issues in this case.[11]

Central to the primary issue in this case is paragraph 11
found in both of the Contracts:

> Approved Supplies.  The Producer warrants
> that he will not use or allow to be used
> during the period of this Contract any feed,
> medication, herbicides, pesticides,
> rodenticides, insecticides or any other item
> except as supplied or approved in writing by
> the Company.  In no way limiting any default
> provision herein, the Producer agrees that
> any breach of this section will result in
> immediate default by the Producer of this
> Contract and the Company may take action so
> provided for in Paragraph 15 herein.

(See Pl.'s Evid. Sub., Tab E and Tab F.)
It is undisputed that this provision was very material to the
Contracts, and it is clear that Yancy had an absolute duty to
perform this provision of the Contract.  It is equally undisputed
that Yancy understood that the use of feed other than feed
authorized and approved by Tyson Foods would be a breach of this
material provision; Yancy admitted as much during his
disposition.

    Q:  And you understood that Tyson was going to
        provide the food for the chickens; correct?
    A:  Yes.
    Q:  And you understood that you couldn't go out
        and buy food from another source?
    A:  Yes.
    Q:  And you understood that you couldn't use any
        feed that wasn't authorized or approved by
        Tyson; correct?
    A:  Correct.

_____

[11]  The state case was removed to this court and is docketed
as Yancy v. Tyson Foods, Inc., et al., CV03-H-748-S.  A motion to
remand that case is pending.

```
Q:   So you understood that it would be a breach
     of contract for you to use any feed other
     than what Tyson authorized or approved you to
     use; correct?
     MR. LITTLE:  I object to the form of the
     question.  It calls for legal conclusion; but
     you can answer, if you know.
A:   Ask me that question again.
Q:   You understand that it would have been a
     violation of you all's agreement to use
     unauthorized and unapproved feed?
A:   Yes.
```

(See Pl.'s Evid. Sub., Tab D at 110-11.)

Clearly Yancy had an absolute duty to perform paragraph 11 of the

Contracts.  See Alpine Construction Company v. Water Works Board

of the City of Birmingham, 377 So.2d 954, 956 (Ala. 1979).  It is

also undisputed that Landman made numerous unauthorized and

unapproved deliveries to Yancy during the relevant time period.

Yancy admits receiving extra feed during such period.  (See Pl.'s

Evid. Sub., Tab C, transcript of trial of State v. Yancy at

304.)  Yancy also admits he was aware of this fact at least by

April 27, 2000.  (See id.)  And it is undisputed that Landman

delivered to Yancy's operation on May 5, 2000 well over 15,000

pounds of unauthorized feed one day after a telephone call on

May 4, 2000 to his house from Yancy's house.  (See id. at 87-94;

137-38; 153-55; also see Pl.'s Evid. Sub., Tab H, Aff. of Deborah

Trautwein and attached Bell South records.)  There is no evidence

arguably suggesting a failure of Tyson Farms to perform any

obligation placed on it under the Contracts prior to that

material breach by Yancy of Paragraph 11 of the Contracts.  Under

Alabama law Yancy's prior material breach justifies any

subsequent nonperformance by Tyson Farms.  Specifically, the

Alabama Supreme Court has held that "a substantial breach by one party excuses further performance by the other." Nationwide Mutual Insurance Company v. Clay, 525 So. 2d 1339, 1343 (Ala. 1987); see also Smith v. Clark, 341 So. 2d 720, 721 (Ala. 1977) ("[T]his Court should not enforce an agreement where the party seeking to enforce the agreement has failed to perform his part of the bargain."). Pursuant to Clay and Smith, Yancy's material breach released Tyson Farms from all subsequent obligations toward Yancy. There being no dispute of a material fact, the court concludes that the motion of Tyson Farms for summary judgment in its favor as to Count I is due to be granted and that Tyson Farms is entitled to the declaration that it has not breached the Contracts. Such declaration will be entered by separate order. Ex parte Steadman, 812 So. 2d 290 (Ala. 2001). Yancy's cross-motion for summary judgment as to the Count I claim is due to be denied.

## V.   Discussion as to Count II and Count III

As noted earlier, Counts II and III of the complaint seek a declaration that Tyson Farms has not maliciously prosecuted or defamed Micky Yancy. Micky Yancy expressly admits that Tyson Farms has not maliciously prosecuted him or defamed him. (See Def.'s December 10, 2002 Reply Brief, Doc. No. 39, at pages 8-9; also see paragraph 1 of Def.'s Answer, Doc. No. 9 and paragraph 59 of the complaint, Doc. No. 1.) See also Ritch v. Waldrop, 428 So.2d 1, 3 (Ala. 1982); Alabama Power v. Neighbors, 402 So.2d 958

19

(Ala. 1981).  Yet an actual dispute still exists as to the Count
II and III claims.  (See footnote 14 and 15, infra, and text
associated therewith.)  There is no dispute of a material fact,
Tyson Farms' motion for summary judgment under Count II and Count
III is due to be granted, and Tyson Farms is entitled to the
declaration sought under Count II and Count III.  Such
declaration will be entered by separate order.  Yancy's cross-
motion for summary judgment as to Counts II and III is due to be
denied.

## VI.  Discussion as to Count IV

As noted earlier, in Count IV Tyson Farms seeks to recover
damages it assets it sustained as a result of Yancy's prior
material breach of the Contracts.  The complaint alleges such
damages to be $22,601.95.  The undisputed evidence establishes
such damages at $18,612.  (See Pl.'s Evid. Sub., Tab C,
transcript of State v. Yancy, at 85, 207-208; also see Def.'s
Evid. Sub., Tab 7, deposition of Dale Gambrill at 144-45).
This is the amount Tyson Foods, Inc. paid to growers in the Snead
Complex to compensate them for a shortage in money paid them as a
result of payments made to Yancy based upon his increased
production.  There is no dispute that such $18,612 was paid by
Tyson Foods, Inc., was properly debited to Tyson Farms and was
the natural and proximate consequence of the conduct of Yancy
which caused his material breach of the Contracts.  (See Pl.'s
Evid. Sub., Tab K, affidavit of Greg Compton.)  Plaintiff's

20

motion for summary judgment under Count IV is due to be granted, and by separate order Tyson Farms will recover such $18,612 from Yancy.  Yancy's cross-motion for summary judgment as to Count IV is due to be denied.

## VII.  Discussion as to Count VI

As noted earlier, Count VI of the complaint, as amended, seeks a declaration that Tyson Farms has not breached obligations it owed to Yancy under the Packers and Stockyards Act.  Yancy admits that no such breach occurred.  (See Def.'s December 10, 2000 Reply Brief, Doc. No. 39, at 8.)  Accordingly, there is no dispute as to any material fact, and Tyson Farms is entitled to the declaration sought in count VI which will be entered by separate order. Yancy's cross-motion for summary judgment under Count VI is due to be denied.

## VIII.  Discussion as to Defendant's Counterclaim

As noted earlier, the motion of Tyson Foods also seeks summary judgment in its favor as to the counterclaim of Yancy for $15,129.00 in damages for Tyson Farms' alleged breach of the Contracts by failing to pay for the chickens and by failing to deliver further chicks to Yancy since June 2000.[12]  Payment was

---

[12] Under the Contracts, Tyson Farms reserved "the right to determine the number, frequency, and type of broiler chicks to be placed in (Yancy's) houses."  (See paragraph 10 of the Contracts, Pl.'s Sub., Tab E and Tab F.)

not due under the Contracts until after June 19, 2002,[13] and
additional chicks were not due to be delivered before the June 9,
2000 pick-up of the chickens for slaughter, well after Yancy's
material breach of the Contracts.  When Yancy committed his
substantial breach of the Contracts at a time when Tyson Farms
had not breached, Tyson Farms was excused from further
performance.  See Nationwide Mutual Ins. Co. v. Clay, 525 So.2d
1339, 1343 (Ala. 1987) (holding that a substantial breach by one
party excuses further performance by the other).  See also Smith
v. Clark, 341 So.2d 720, 721 (Ala. 1977) (holding that a court
should not enforce an agreement where the party seeking to
enforce the agreement has failed to perform his part of the
bargain).  Whether the amount not paid is $15,129.00, or
$25,658.83 as now urged by Yancy in his brief is immaterial.
(See Def.'s December 10, 2002 brief, Doc. No. 39, at 4.)  Tyson
Farms does not owe Yancy damages for the claimed breaches of the
Contracts.

There is no dispute as to any material fact, and the court
concludes that Tyson Farms is entitled to judgment in its favor
on Yancy's counterclaim.  A separate order to that effect will be
entered.

---

[13]  Payment was not due until ten days following "the week
of slaughter." (See paragraph 3 of the Contracts.)  According to
Yancy, the chickens were picked up June 9, 2000.

### IX.  Discussion as to Count V

Yancy correctly points out that Tyson Farms did not seek summary judgment with regard to count V wherein Tyson Farms seeks compensatory and punitive damages from Yancy for alleged fraud and suppression.  Tyson Farms describes the compensatory damage as "approximately $18,612.00 -- money which was due other growers and money which Tyson Farms was obligated to pay and did pay ... the other growers."  (See Pl.'s December 10, 2002 Response Brief, Doc. No. 38, at 15.)  This is the same damage to be compensated by the judgment to be entered in favor of Tyson Farms under Count IV.  (See supra, Section VI.)  Any fraud by Yancy, under the evidence presented, would only be suppression of material facts under Ala. Code § 6-5-102, but evidence before the court is sufficient to create a factual issue as to the presence of active concealment.  See Bank of Red Bay v. King, 482 So.2d 274, 285 (Ala. 1985).  Sufficient evidence is also before the court to create a factual issue as to an award of punitive damages, even though Tyson Farms will not be permitted to collect the actual damage more than once.  Accordingly, the cross-motion of Yancy for summary judgment in his favor as to Count IV is due to be denied.

### X. Conclusion

In accordance with the foregoing, there being a dispute as to material facts, the November 8, 2002 cross-motion of Yancy for summary judgment in his favor on all claims asserted by plaintiff

23

in the complaint, as amended, is in all respects due to be denied. Further, in accordance with the foregoing, there being no dispute as to any material fact, the motion of Tyson Farms for summary judgment in its favor with regard to the relief sought in Count I, Count II, Count III, Count IV and Count VI is due to be granted, and such relief will be awarded under a separate judgment. Further, in accordance with the foregoing, there being no dispute as to any material fact, the motion of Tyson Farms for summary judgment in its favor with regard to defendant's counterclaim is due to be granted, and the separate judgment to be entered will also award judgment in favor of Tyson Farms as to the counterclaim.

It should come as no surprise that the dispute presented and the claims and counterclaim asserted herein are not the only dispute and claims arising out of the operative facts out of which this case arose. On March 4, 2003 Yancy filed a complaint in the Circuit Court of Jefferson County arising out of the same operative facts.[14] The complaint has nine (9) counts[15] and names as defendants Tyson Foods, Inc., Tyson Foods of Alabama, Inc.,[16] and Eugene Landman. The state court case was timely removed to this court on April 3, 2003, and there is pending a motion by

_____

[14]   See footnote 11, supra, and text associated therewith.

[15]   The claims include breach of contract, tort of outrage, invasion of privacy, defamation, intentional interference with a business relationship, fraud, conspiracy, malicious prosecution and false imprisonment.

[16]   Tyson Foods of Alabama, Inc. merged in 1999 with Tyson Farms, Inc., plaintiff in this action.   See footnote 1, supra.

Yancy to remand the case to state court.  All defendants named in the state court suit are defendants under each of the nine counts.  The declarations to be included in the separate judgment to be entered in this case directly affect claims against Tyson Farms in the state court action.  While this is obviously correct as to the breach of contract, malicious prosecution and defamation claims, any of the remaining claims in the state court case against Tyson Farms which were compulsory counterclaims in this action may also be affected.[17]  The separate judgment to be entered in this case will dispose of all issues and claims in this action other than the remaining claim for punitive damages under Count V.  The court expressly determines that there is no just reason for delaying the entry of such judgment as a partial final judgment under Fed. R. Civ. P. 54(b), and the court expressly directs that the separate judgment to be entered herein be entered as a partial final judgment under Rule 54(b).

DONE this _19th_ day of June, 2003.

_James H. Hancock_
SENIOR UNITED STATES DISTRICT JUDGE

---

[17]  Orders entered herein on September 4, 2001 and October 15, 2001 required any amendments affecting the issues or parties to this action to be filed by December 8, 2001.  Thus any compulsory counterclaim had to be asserted herein by December 8, 2001.